**BUILDING AND CONSTRUCTION TRADES DEPARTMENT, AFL–CIO, et al., Plaintiffs,**

v.

**Raymond J. DONOVAN, et al., Defendants.**

**Civ. A. No. 82–1631.**

United States District Court, District of Columbia.

July 22, 1982.

Laurence Gold, AFL–CIO, Washington, D. C., for plaintiffs.

Surrell Brady, U. S. Dept. of Justice, Civ. Div., Washington, D. C., for defendants.

## MEMORANDUM ORDER

HAROLD H. GREENE, District Judge.

This is a motion for a preliminary injunction [1] which seeks to restrain the enforcement of certain regulations issued in implementation of the Davis-Bacon Act, 40 U.S.C. § 276a *et seq.*, and the Copeland Anti-Kickback Act, 40 U.S.C. § 276c. The regulations are to take effect on July 27, 1982.[2]

### I

■ The Davis-Bacon Act was enacted in 1931 and substantially amended to achieve its present format in 1935. Its principal purpose is to protect employees on federal projects by guaranteeing to them a minimum wage based on local prevailing wage rates. The Copeland Anti-Kickback Act was enacted in 1934, its purpose being to deter kickback practices by contractors on public construction projects. The issues here revolve around regulations issued after appropriate rule-making[3] by the Secretary of Labor in May 1982 which depart significantly in five respects from the regulations or interpretations which have been in effect since the early 1930s. The plaintiffs challenge the legality of the regulations in all of these respects.

On this motion for preliminary injunction the Court must consider whether plaintiffs have demonstrated (1) a strong showing that they are likely to prevail on the merits of their claims; (2) that without an injunction they will be irreparably injured; (3) that issuance of the injunction will not substantially harm other parties interested in the proceedings; and (4) that the public interest favors the grant of an injunction.

*Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C.Cir.1977).

### II

In the view of the Court, plaintiffs have demonstrated a substantial likelihood that they will prevail on the merits. That conclusion is based in part on the Court's review of the language of the statute and its legislative history (which are discussed in this part of the opinion) and on the long and consistent administrative practice prior to the issuance of the new regulations (Part III *infra*).

■ 1. The Davis-Bacon Act establishes that the Secretary shall issue wage determinations based on the "wages . . . prevailing for the corresponding classes of laborers and mechanics" in the area. The parties are in disagreement on the question whether this language permits the Secretary to issue regulations which would permit a substantial increase in the issuance of wage rates for semi-skilled "helpers." The new regulation provides for such an increase (1) by defining "helpers" as a class of "mechanics or laborers"; (2) by eliminating the requirement that the helper classification be prevailing in an area as long as it is "identifiable"; (3) by allowing the use of helpers for forty percent of the total number of workers in a particular classification and by permitting even that limit to be exceeded under certain circumstances; and (4) by adding helper classifications to a wage determination even though they were not included at the time the contract was awarded. In the opinion of the Court, these changes are not consistent with the statute.

1. Plaintiffs are the Building and Construction Trades Department, AFL–CIO; the American Federation of Labor and Congress of Industrial Organizations, and several other labor unions. Raymond J. Donovan, Secretary of Labor; and Robert B. Collyer, Deputy Secretary of Labor for Employment Standards; and William M. Otter, Administrator of the Wage and Hour Division, are defendants herein.

2. The action was filed on June 11, 1982. On July 9, 1982, plaintiffs sought a temporary restraining order, but that application was not pressed in view of the Court's commitment to hear the preliminary injunction motion and cross motions for summary judgment prior to July 27, 1982. Briefs were filed on July 15 and 19, and a hearing was held on July 20. Because of the short deadline, the Court is deciding today only the preliminary injunction issues; the summary judgment motions are under advisement.

3. There are no claims of procedural irregularity.

At the time of enactment of the Davis-Bacon Act, Congress was acutely conscious of efforts by some employers to classify workers as "helpers" in order to avoid paying the skilled laborers' wage.[4] The Senate Committee report noted that wage standards had

> largely broken down by intermediate classifications of labor and failure to retain the strict lines of demarcation intended to be drawn and maintained between skilled and unskilled labor. The whole tendency has been for wages of the skilled group to descend toward the level of the unskilled group, this by reason of intermediate classification devices.

The report concluded by recommending that construction contracts contain a provision stating that the minimum wages to be paid "various classes of laborers and mechanics" shall be based on wages prevailing "for the corresponding classes of laborers and mechanics," the language ultimately adopted in 1935. See S.Rep.No.332, 74th Cong., 1st Sess. (1935), Part 3, at pp. 13, 15–17.

The new regulations will permit precisely that which Congress intended to halt in 1935. The concept of "classes of laborers or mechanics" was and is central to the statutory scheme. Under existing and long-established industry and administrative practice, a "class" of workers is one that has been historically recognized as such and whose members perform well-defined tasks. Helpers have therefore been recognized as a class only when their use has been prevailing in an area and they have formed a distinguishable group performing discrete tasks.

Under the new regulations, helpers not only are not defined in traditional terms, but they may perform any task throughout the entire construction field: they are "general helpers." As a consequence, such individuals would be allowed, at the discretion of the contractors, to perform the tasks of laborers, of journeyman mechanics, and of laborers and mechanics on a cross-craft, multi-trade basis. Obviously, if contractors could thus assign a helper to perform the tasks of any and all classes of laborers and mechanics and they could do so at lesser pay, they will do just that, and the requirement that wages be based on "corresponding classes" will effectively be read out of the law.[5] As the Wage Appeals Board said in *Fry Brothers Corp.*, 123 WAB No. 76–6 (June 14, 1977), at pp. 15–16:

> If a construction contractor who is not bound by the classifications of work at which the majority of employees in the area are working is free to classify or reclassify, grade or subgrade traditional craft work as he wishes, such a contractor can, with respect to wage rates, take almost any job away from the group of contractors and the employees who work for them who have established the locality wage standard. There will be little left to the Davis-Bacon Act.

Moreover, under existing administrative practice, a helper classification is recognized only if it is "prevailing" in a particular area; under the new regulations, the use of helpers need only be "identifiable" to be recognized. Yet the statute itself refers to "wages ... prevailing for ... classes," not to wages identified for classes.[6] The effect of this change will be that when there is a single "helper" or a small group of helpers in a town or a metropolitan area, helpers may be employed in substitution of tradi-

---

4. See, *e.g.*, 1932 House Hearings at 109–10; 1934 Hearings before a subcommittee of the Senate Committee on Education and Labor, pursuant to S.Res. 228, 73rd Cong., 2d Sess. (1934), pp. 414, 428, 559, 530–31.

5. Former Secretary of Labor John T. Dunlop states in an affidavit submitted to the Court that

> there is no practice of 'jack-of-all-trades' helpers much less multi-craft helpers. Inject-

ing these foreign classifications under these circumstances and providing contractors use them a competitive advantage reflects not recognition of industry's practice or local practice, but has the consequence of undermining prevailing recognized local practices and wage rates.

6. If there is no prevailing practice in the locality to employ helpers, they may not be used for Davis-Bacon Act purposes.

tional craft workers throughout that area in all aspects of construction work. In that respect, again, the new regulations will depart both from prior practice and from the central purpose of the Act.

For these reasons, it is unlikely that, when the merits are reached, this regulation can be allowed to stand.[7]

■ 2. The 1935 amendments to the Act direct the Secretary, in his ascertainment of the prevailing wage, to determine wages for "projects of a character similar to contract work." 40 U.S.C. § 276a(a). The present regulation, which became effective contemporaneously with the 1935 statutory enactment, permits the Secretary, in performing this function, to include the wages paid in federal construction projects. The regulation issued two months ago explicitly mandates to the contrary that in compiling wage rate data the Secretary "will not use data from Federal or federally assisted projects" unless wage data from the private sector are insufficient for the Secretary's purpose.[8] In the opinion of the Court, the existing regulation far more faithfully reflects the intent of Congress than that which has just been issued.

In the first place, the statute expressly mandates the Secretary to consider "projects of a character similar"; not "*private* projects of a character similar." If a limitation or qualification is to be read into the statute it would have to be on the basis of extrinsic aids to construction, such as legislative history or administrative practice. But these aids support the plain meaning of the statute; they do not contradict it.

The congressional committee reports published at the time of the original enactment of the Davis-Bacon Act in 1931 indicated that only "wages established by private industry" could be regarded as constituting the appropriate standard for the ascertainment of the prevailing wage. However, a serious problem arose with this standard when, during the Depression, very little private construction was going on. Accordingly, notwithstanding the congressional mandate, both Secretary Doak and Secretary Perkins considered also data from publicly-financed projects in determining wage rates for Davis-Bacon Act purposes, and this administrative practice was duly drawn to the attention of the Congress when it considered amendments in 1934.

The amendments were enacted in 1935, and the language "work of a similar nature" was changed to "project of character similar to the contract work"—a change which directed an alteration of the focus from similarity of tasks to similarity of projects. Further, notwithstanding the departmental practice after 1931, neither the committee reports nor the legislative debates this time contained any language which could be read as restricting the universe of projects to those of a private nature.

■ It appears to the Court that this history does not support the conclusion that, contrary to the language of the statute, Congress intended to limit, and did limit, the Secretary to private construction in making his wage determinations. It follows that this aspect of the regulation is unauthorized by law.[9]

---

**7.** The Secretary defends the regulation in part on the ground that it will facilitate non-formal training of women, minorities, and young workers. Memorandum, p. 38. In fact, it will assign members of such groups to the lowest classification of workers, and it is likely to keep them there on a permanent or long-term basis. Much of the Secretary's other explanations for the new regulation revolve around cost savings, but there are also references to his belief that the use of helpers will increase efficiency and productivity and to the fact that helpers are widely used in private industry. None of these reasons satisfactorily explains the departure from prior practice. See Part III *infra*.

**8.** Certain types of projects are also exempt.

**9.** The Secretary seeks to justify his change in the regulations on the basis of the argument that the inclusion of data from government construction projects improperly raises the level of the prevailing wage. However, as the Supreme Court has pointed out, "the Davis-Bacon Act 'was not enacted to benefit contractors, but rather to protect their employees from substandard earnings by fixing a floor under

3. The next point of dispute between the parties concerns the wage rates to be used where there has been no significant construction on the basis of which a prevailing wage rate could be established, especially with respect to rural areas. The Davis-Bacon Act provides that the geographic reference point for prevailing wage determinations is the "city, town, village, or other civil subdivision of the state in which the work is to be performed...." 40 U.S.C. § 276a(a). Long-standing regulations provide that

> If there has been no similar construction within that area in the past year, wage rates paid on the nearest similar construction may be considered.[10]

The regulation just issued contains similar language but adds a proviso to the effect that

> ... projects in metropolitan counties may not be used as a source of data for wage determination for a rural county.

The legislative history of the Act shows that the drafters concluded that, as Congressman Connery, chairman of the House Committee on Labor in 1931, put it when asked about the establishment of prevailing wage rates with respect to small towns, "[t]he only practical way the Committee found was that if you had a small town between two large cities they would take the prevailing wage scale of those two cities." 75 Cong.Rec. 12376–77. See also, the debate reported in 75 Cong.Rec. 12365–66.[11]

The Secretary correctly points, on the other hand, that concern had been ex-

pressed in Congress about the indiscriminate importation of metropolitan wages to upset rural wage scales. *Legislative History of the Act Amending the Prevailing Wage Section of the Davis-Bacon Act,* House Committee on Education and Labor, 88th Cong., 2d Sess. at 24 (1964); see also, Senate Report No. 332, 74th Cong., 1st Sess. pp. 10, 13 (1935).[12]

It is fair to say that the legislative history is mixed, and the Court concludes that without the consideration of the factor of administrative practice (see Part III *infra*), the proper meaning of the statute on this aspect of the case would not be free from doubt.

4. Section 1 of the Davis-Bacon Act provides that every covered federal construction contract shall contain a provision stating the minimum wages to be paid various classes of laborers and mechanics that "will be determined by the Secretary of Labor to be prevailing" for corresponding classes of laborers and mechanics. Existing regulations provide that [13]

> in the event that there is not a majority paid at the same rate, then the [prevailing wage rate in the area shall be that] paid to the greater number: Provided, such greater number constitutes 30 percent of those employed.

The new regulation [14] specifies that the prevailing wage shall be

> the wage paid to the majority (more than 50%) [or] if the same wage is not paid to a majority ... the 'prevailing wage' shall be the average of the wages paid, weight-

---

wages on Government projects.'" *Walsh v. Schlecht,* 429 U.S. 401, 411, 97 S.Ct. 679, 686, 50 L.Ed.2d 641 (1977).

**10.** Another regulation (sec. 7 of regulation 503) refers to use of data from the "nearest large city" when there has been no construction of a similar character in recent years. These regulations appear to have been consistently interpreted as permitting the use of wage data from nearby metropolitan centers for the establishment of the prevailing wage for a rural area.

**11.** And see, 25 U.S.C. § 450e; 33 U.S.C. § 1372; and 12 U.S.C. § 1749a(f) where the Congress, unlike here, limited wage applica-

tions to "similar construction in the *immediate* locality" (emphasis added).

**12.** However, the Secretary's reference (Memorandum, p. 23) to a statement by Congressman Bacon, in which he warned against the importation of "cheap bootleg labor" into a community, is ill-advised, for it does not demonstrate that Congress, which was basically interested in protecting workers against substandard wages, objected to the use of metropolitan wages in nearby small towns.

**13.** See 29 C.F.R. § 1.2(a).

**14.** 47 Fed.Reg. 23,652 (1982).

ed by the total employed in the classification.

The Secretary's position with respect to this provision, too, is not without support.

It has consistently been held that the Act itself does not establish any definition of "prevailing wage," this being the Secretary's responsibility.[15] This principle would seem to be sufficient to allow the Secretary to select a standard other than the thirty percent rule, provided it is a reasonable one.

Plaintiffs rely to the contrary primarily upon a dictionary definition of "prevailing" as meaning more frequent, as distinguished from being a synonym for "majority." Even if one were to consider this to be the true test of the meaning of the statute, it does not exclude the possibility that the Secretary, in the exercise of his discretion and on the basis of his expertise, may choose a fifty percent standard as being prevailing.

■ Thus, it would appear that if this issue came up on a blank slate, the new regulation would be upheld. However, the fact is that the Secretary has given no reasoned explanation for the new regulation,[16] which departs from a rule adopted by the Department of Labor on the very day the 1935 Act became effective. Thus, for the reasons discussed below, it is likely that on this basis the plaintiffs will be able to prevail on this aspect of the case when the Court reaches the merits.

■ 5. The Copeland Act requires the Secretary to issue regulations for federal contractors, including regulations requiring them to "furnish weekly a statement with respect to the wages paid each employee during the preceding week." 40 U.S.C. § 276c. The question in dispute between the parties is whether the statute requires the actual submission of the contractors' weekly payroll—as the current regulation does [17]—or whether it sanctions the new regulation which requires only the submission of a statement of compliance in which the contractor certifies that he has paid the required wages to all of his employees.[18]

The Secretary rests essentially on the proposition that the statute makes no mention of payrolls or payroll records, and on the statement of Senator Copeland, sponsor of the law, to the effect that only affidavits "about" the payroll are required. Memorandum, p. 32. But these arguments fail to address the central fact that the statute requires contractors to submit to the Secretary each week information as the wages paid to "each employee" during the preceding week. A general affidavit covering the wages paid to all the employees during the preceding week obviously does not comply with that mandate.[19]

Moreover, it appears, contrary to the Secretary's position, that actual payroll information is essential to the achievement of the Act's purposes.[20] Unless precise records

---

**15.** However, as noted in note 27 *infra*, the Secretary is given broad, basically unreviewable discretion primarily with respect to individual wage determinations, not with regard to rulemaking decisions.

**16.** The Secretary's reasons for adopting a new regulation—primarily that the thirty percent rule gives undue weight to collective bargaining and that it is inflationary—are not in the least persuasive, for they bear no relationship to the purposes of the statute.

**17.** Sections 5.5(a)(3), 3.3(b), and 3.4.

**18.** 47 Fed.Reg. 23668, to be codified at 29 C.F.R. § 55(a). The regulation also provides that the contractor shall submit the payroll records upon request of the Secretary.

**19.** The legislative history likewise supports the payroll submission requirement. See Senate

Report 332, 74th Cong., 1st Sess. 5–6 (1935); Hearings Before the Subcommittee of the Committee on Commerce Pursuant to S.Rep. 74, 73rd Cong., 2d Sess. (1933) pp. 791–97, 816–17; 1934 Hearings of Senate Committee on Education and Labor, pp. 192–93. Indeed, an effort in 1979 to eliminate the requirement of payroll submission failed of enactment.

**20.** Both the Department of Labor and other departments have publicly so stated in the recent past. See Hearings before the Senate Committee on Labor and Human Resources, S.1319, 96th Cong., 1st Sess., pp. 277–79 (July 17–19, 1979); Hearings on S.3061, before the Subcommittee on Federal Spending Practices and Open Government of the Senate Committee on Government Affairs, 96th Cong., 1st Sess., p. 147 (1979).

are submitted to the Department on a weekly basis, they will in many instances never become available, inasmuch as—largely because of the transient nature of much construction business [21]—many contractors and subcontractors maintain neither offices nor permanent records. Indeed, even if those conditions were absent, generalized statements that there has been compliance would not give enforcement personnel even the beginnings of a basis for further investigation. In short, it appears that enforcement of the Act would be in serious jeopardy if the new regulations were to be substituted for the present practice.[22]

For these reasons, the Court concludes that, on the basis of the statutory language and its purpose alone, plaintiffs have demonstrated a strong likelihood of success with respect to the Copeland Act regulations.

### III

As seen in the necessarily brief survey *supra*, it is clear, at a minimum, that the language and history of the two laws lend at least as much support to plaintiffs' position as to the Secretary's, and that with respect to several of the provisions only the construction advanced by the former is consistent with the statute. With the case in that posture, the Court may look appropriately for guidance to administrative interpretation and practice. That interpretation and that practice reveal the following.

Administrative construction that was contemporaneous with the adoption of the Davis-Bacon Act conclusively supports the views espoused here by the plaintiffs in every significant respect.[23] Those who knew best what Congress intended—the administrators who issued interpretative regu-

lations within a short period after the enactment of the statute, sometimes within days—fully support by their actions the arguments made by the plaintiffs regarding congressional intent and the inferences they ask the Court to draw with respect to the meaning of these laws. On that basis alone, it would be difficult to escape the conclusion that the statutes should be so interpreted. See, *e.g.*, *FTC v. Mandel Bros.*, 359 U.S. 385, 391, 79 S.Ct. 818, 823, 3 L.Ed.2d 893 (1959).

That is not all. For forty-seven years thereafter, through the administrations of eight Presidents[24] and fifteen Secretaries of Labor[25] of many political and ideological persuasions, those interpretations and those regulations stood without substantive alteration. During that period none of the administrators effected the kinds of fundamental changes that are brought about by the regulations adopted two months ago; instead, the various Secretaries of Labor continued to interpret and enforce the laws precisely in accordance with the original understanding. Nor can this stability and consistency in construction by those charged with the laws' enforcement be attributed to inattention, oversight, or neglect (as is sometimes true when relatively obscure laws or regulations are involved). The Davis-Bacon Act is and always has been a well-known law, affecting millions of employers and wage-earners throughout the United States, and it has frequently been the subject of political and other controversy.

█ Such consistent, unwavering administrative construction must be accorded very substantial weight by the Court. See, *e.g.*, *Norwegian Nitrogen Co. v. United*

---

21. Often, workers are hired on a daily basis and they are paid in cash.

22. Present practice does not require contractors to generate records solely for purposes of the Copeland Act. A contractor will be in full compliance simply by providing duplicates of their payroll records which he must maintain in any event to comply with the Fair Labor Standards Act. See 29 C.F.R. § 5.16.

23. The Secretary has made no substantial effort to contest that conclusion.

24. Presidents Roosevelt, Truman, Eisenhower, Kennedy, Johnson, Nixon, Ford, and Carter.

25. Secretaries Doak, Perkins, Schwellenbach, Moses, Tobin, Durkin, Mitchell, Goldberg, Wirtz, Shultz, Hodgson, Brennan, Dunlop, Usery, and Marshall.

*States,* 288 U.S. 294, 53 S.Ct. 350, 77 L.Ed. 796 (1933); *United States v. Leslie Salt Co.,* 350 U.S. 383, 396, 76 S.Ct. 416, 423, 100 L.Ed. 441 (1956); *Andrus v. Shell Oil Co.,* 446 U.S. 657, 673 n. 12, 100 S.Ct. 1932, 1941 n. 12, 64 L.Ed.2d 593 (1980). Justice Cardozo's statement in *Norwegian Nitrogen* is particularly apt:

> ... administrative practice, consistent and generally unchallenged, will not be overturned except for very cogent reasons if the scope of the command is indefinite and doubtful .... The practice has peculiar weight when it involves a contemporaneous construction by the men charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new.

288 U.S. at 315, 53 S.Ct. at 358.

The Secretary's reply is that an agency is not bound to adhere to prior erroneous practice for all time but may make adjustments and changes in the light of its expertise and experience. That principle is unexceptionable in the abstract, but it is also more directly applicable to the exercise of broad public interest-type discretion than it is to actions which are essentially exercises in statutory construction.[26] Moreover, the Secretary's principle does not seem to have been successfully pleaded in the past to defeat interpretations and administrative practices as open and consistent as those

revealed by this record.[27] See *Baltimore & Annapolis R. Co. v. WMATA,* 642 F.2d 1365 (D.C.Cir.1980), where the court referred to the fact that the agency attempted to overturn the position taken in "an order issued only a few years after an enactment of the [statute] and allowed to stand without challenge or contradiction for more than twelve years." Under these circumstances, said the court, it would not be justified in merely deferring to the agency's conclusion but would make an independent judgment, examining the agency's conclusions with "more exacting vigilance" than would otherwise be employed. 642 F.2d at 1371.

In any event, when an agency abruptly changes a longstanding administrative position, regardless of the context, it may be expected at a minimum to show that the earlier understanding of the statute was wrong or that experience has proved it to be defective.[28] As indicated *supra,* the Secretary has done neither; his primary reliance throughout has been on cost and cost savings—matters neither of novel experience nor of special expertise, but well known to and considered by the Congress as early as 1931.

The basic purpose of the Davis-Bacon Act is to protect the wages of construction workers even if the effect is to increase the costs of construction to the federal government. In 1931 and 1935—notwithstanding

**26.** For that reason, the decisions on which the Secretary relies are not apposite here. In *New Castle v. CAB,* 371 F.2d 733 (D.C.Cir.1966), the court was dealing with a statute which left to the agency broad authority to regulate in the public interest. Under such circumstances, indicated the court, the agency is not precluded from effecting changes in furtherance of a new philosophy. *Office of Communications of United Church of Christ v. F.C.C.,* 590 F.2d 1062 (D.C.Cir.1978), which is the other case cited, is to the same effect, the court using such language as "open-ended provisions" and "discretion to strike a balance." 590 F.2d at 1068. Here the Secretary does not claim to be acting on the basis of a new philosophy; he asserts that he is merely implementing the congressional purpose on the basis of improved experience and expertise.

**27.** Likewise inapplicable is the line of cases cited by the Secretary which exempts wage

determinations made by the Department of Labor from judicial review. See, *e.g., United States v. Binghamton Construction Co., Inc.,* 347 U.S. 171, 74 S.Ct. 438, 98 L.Ed. 594 (1954); *Universities Research Association, Inc. v. Coutou, supra,* 450 U.S. 754, 101 S.Ct. 1451, 67 L.Ed.2d 662 (1981). These decisions all concern specific, individual wage determinations, not broad regulatory changes. Indeed, a number of decisions hold that general rules are *not* immune from judicial scrutiny. See *Commonwealth of Virginia v. Marshall,* 599 F.2d 588, 592 (4th Cir. 1980); *North Georgia Bldg. & Const. Trades v. Goldschmidt,* 621 F.2d 697 (5th Cir. 1980).

**28.** See *Greater Boston Television Corporation v. F.C.C.,* 444 F.2d 841 (D.C.Cir.1970); *Columbia Broadcasting System, Inc. v. F.C.C.,* 454 F.2d 1018, 1026 (D.C.Cir.1971).

such opposition as that of President Hoover who cited a "great increase in expense to the taxpayer" as one of his principal grounds [29]—the wage-floor philosophy prevailed over that which regarded low cost to the government as the prime consideration. The Congress enacted the statute which embodied that philosophy; it later further strengthened that law; and it never repealed, modified, or weakened it in any way.

It is not for the Court to judge whether the basic policy decision to prefer wage floors over expense to the government was or is wise. More to the point, it is not for the Secretary of Labor or his subordinates to make that judgment. Under our constitutional system, policy decisions are not made by government administrators; they are made by the Congress. In this instance Congress made its decision, first in 1935 by the enactment of the Davis-Bacon Act, and then again in the forty-seven years since that time by the failure and refusal of succeeding Congresses either to change the law or to suggest that in all these years it had been improperly interpreted and applied.

For these reasons, the Court finds that plaintiffs have shown a strong likelihood of success on the merits.[30]

## IV

■ The balance of interests and injuries likewise weighs heavily in favor of plaintiffs.

Some 600,000 contracts subject to the Davis-Bacon Act or related statutes appear to be in force at any one time, and approximately $43 billion is spent annually for construction work covered by these statutes. These construction projects are governed by complicated sets of procedures, including proposals, evaluations, reviews, bids, and contracts clauses, with labor standards requirements interwoven throughout.[31] It is obvious that substantial confusion would result if contracts were bid under the new regulations and these regulations were at some future date declared to be invalid. This would harm not only the employees whose wages would be reduced in the interim but also the employers who would be confronted with an almost impenetrable maze of changes and recomputations. The public would likewise be injured, for it would hardly benefit from the disruption of the contracting process that would inevitably follow from a change in the status quo before the legality of the regulations had been determined with finality.

There is no comparably urgent need for allowing the regulations to become effective immediately. All concerned have lived under the old regulations and interpretations for well over forty years. Two and one-half years have passed since the effort to change the regulations was begun. An additional period of delay while the legality of the regulations is judicially determined with finality cannot significantly harm either the government or others.[32] The Secretary relies on an affidavit from the Administrator of the Wage and Hour Division in support of his claim of immediate and irreparable harm. But this affidavit in the

---

**29.** *The Legislative History of the Davis-Bacon Act*, House Committee on Education and Labor, September 1962, p. 13.

**30.** This does not mean that the Court has concluded that every one of the provisions at issue in this lawsuit will ultimately be found to be unauthorized by the statute and hence invalid. Notwithstanding the general infirmity stemming from the Secretary's departure from contemporaneous and consistent administrative interpretation, it may be that, on the merits, it will be found that the Secretary has sufficient latitude under the statute with respect to one or more of the regulatory provisions to adopt his current construction.

**31.** Plaintiffs have suggested that some fifty-eight substantive laws enacted by the Congress include Davis-Bacon Act standards.

**32.** For that reason, this case is unlike *Metzenbaum v. Edwards,* 510 F.Supp. 609 (D.D.C.1981), where this Court refused to issue a preliminary injunction against enforcement of President Reagan's oil decontrol order. That injunction was sought several weeks after decontrol had already occurred and the industry had adjusted to its terms.

main demonstrates only that internal administrative *preparations* have been made for implementation of the new regulations [33]—not that anything has been done that cannot easily be undone or that cannot be used at a later date in the event the regulations are subsequently declared to be valid.

The Secretary points to the cost to the government from a delay in enforcement, the obvious premise being that construction can be achieved more cheaply under the new regulations than under the old. In response it may be observed, once again, that this is a cost that is inherent in the policy decision Congress made in 1935 and maintained for the past forty-seven years. Beyond that, costs to the government are not the only ones to be considered on a balance of the injuries and the equities.

Several categories of persons will suffer significant injury if the new regulation is improvidently permitted to take effect notwithstanding its apparent invalidity, as follows. First, those now employed under construction contracts governed by the current regulations will, under the new regulations, be forced to accept lower wages—a change for which they will have no legal avenue of redress. Second, either journeymen craft employees are likely to be replaced by helpers or they will be forced to work at helper wages if they wish to work at all. Third, union contractors who are parties to collective bargaining agreements will be squeezed out of the procurement process by contractors who are able to make lower bids under the new regulations. None of these injuries is likely to be remediable in the event that it is ultimately decided on the merits that the regulations are invalid.

The Court concludes that, upon a balancing of the harm to the plaintiffs, the defendants, and the public, from either a denial or a grant of an injunction, and taking into account the likelihood that plaintiffs will succeed on the merits, it is appropriate that a preliminary injunction issue.

## V

For the reasons stated, it is this 22nd day of July, 1982,

ORDERED That defendant Secretary of Labor Ray Donovan and all officers, agents, and employees under his direction and control be and they are hereby enjoined and restrained from administering, enforcing, or giving any force and effect to the regulations published in the Federal Register on May 28, 1982, implementing the Davis-Bacon Act and its related statutes (47 Fed. Reg. 23644–23676) to be codified as 29 C.F.R. §§ 1.2(a), 1.3, 1.7(b) and (d); 29 C.F.R. §§ 5.2(n)(4), 5.5(a)(1)(ii)(A) and (B), 5.5(a)(3)(ii) and (III), and 5.5(a)(4)(iv); and 29 C.F.R. § 3.3(b), pending final disposition of this action.

---

33. The affidavit is studded with phrases indicating that instructions, analyses, or memoranda "are being prepared [or] revised [or] conducted . . . ."