**GPA INCORPORATED, Plaintiff,**

v.

**LIGGETT GROUP, INC., Defendant.**

**No. 94 Civ. 5735 (AGS).**

United States District Court,
S.D. New York.

Aug. 30, 1994.

OPINION AND ORDER

SCHWARTZ, District Judge:

This is an action by GPA Incorporated ("GPA"), a middleman [1] in the chain of distribution of cigarettes, against Liggett Group Inc. ("Liggett"), a manufacturer of private label and control label cigarettes, for breach of the March 1, 1993 Controlled Label Manufacturing Agreement (the "Agreement") between the parties, tortious interference in customer relationships, violations of Section 43(a) of the Lanham Act and the return of certain monies (the "Rebate Fund") allegedly held by Liggett as an agent and fiduciary for GPA. GPA moves for preliminary injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure. Specifically, GPA seeks an order: (1) directing Liggett to return the Rebate Fund, (2) directing Liggett to continue to supply GPA with cigarettes pursuant to the Agreement, (3) enjoining Liggett from disclosing GPA's confidential business information, (4) enjoining Liggett from dealing with GPA's customers with respect to the products subject to the Agreement, and (5) directing that all papers filed in this action be under seal.[2] Liggett contends that injunctive relief is inappropriate because GPA has failed to demonstrate irreparable injury or likelihood of success on the merits and the negative effects of an injunction to Liggett outweigh the benefits to GPA.

The Court has considered the substantial submissions of the parties (including numerous affidavits, declarations and post-hearing submissions), the arguments of counsel and the testimony of the witnesses at a hearing conducted on GPA's motion on August 16 and 22, 1994 (the "Hearing"). For the reasons set forth below, GPA's request for preliminary injunctive relief is denied.

## FACTS

### A. The Parties

GPA is a Missouri Corporation with its principal place of business in St. Louis. GPA

Michael B. Golden, Rosner Bresler Goodman & Golden, New York City, for plaintiff.

William Cavanaugh, Patterson, Belknap, Webb & Tyler, New York City, for defendant.

1. GPA describes itself as a distributor of private label cigarette brands which it obtains directly from manufacturers to resell to its customers. In contrast, Liggett refers the Court to a GPA Dun & Bradstreet report that describes GPA as a broker.

2. By Stipulation and Order, so ordered by the Court on August 26, 1994, all issues with respect to the Rebate Fund have been resolved. Additionally, upon the request of both parties, pursuant to an Order dated August 17, 1994, all documents and the transcripts of all proceedings in this case shall be filed under seal.

"has been in the business of nationally distributing 'private label' cigarettes since 1988 beginning with the distribution of SHIELD brand cigarettes, manufactured by Philip Morris and expanding in 1993 with the signing of the Agreement with Liggett". Affidavit of Mark Dunham, President of GPA, sworn to August 7, 1994 ("Dunham Affidavit") at ¶ 12. GPA is a minor player in the extremely competitive and well populated multibillion dollar domestic market for private label cigarettes: its sales represent less than 2% of the total market. *Id.* at ¶ 13.

Liggett is a Delaware Corporation with its principal place of business in North Carolina. According to Liggett, it is the leader in developing a market for discounted cigarettes including private label and control label cigarettes. Private label cigarettes are typically manufactured by one of the major cigarette companies, but the trademark is held by the customer of the manufacturer. Private labels are sold at a deep discount to co-op grocery organizations, chain grocery stores and distributors, and other chain retailers. A "control label" is a trademark held by the manufacturer but sold using the same concept as a private label. It is not disputed that Liggett is continuing to sell EAGLE and EPIC cigarettes to GPA's former customers at prices below those charged by GPA.

### B. *The Agreement*

It is undisputed that GPA and Liggett entered into a Controlled Label Manufacturing Agreement (defined above as the "Agreement") on March 1, 1993. The Agreement describes its "general purpose" as follows:

3. According to Liggett, the purpose of the Agreement was "to obtain coverage in this market segment of the distributor class of trade without utilizing Liggett sales personnel. In return, ... Liggett gave GPA extraordinarily low factory prices, and allowed GPA to keep to itself any remainder from 'selling' the product." Declaration of Charles D. Harrison, National Director of Corporate Accounts for Liggett, dated August 12, 1994 ("Harrison Declaration") at ¶ 12 (footnote omitted).

4. 19. *TERMINATION.*
(a) *By Either Party Without Cause.*
Either party may terminate this Agreement at any time without cause by notice to the other party, which notice shall be effective as specified in § 19(c) hereof.

... Liggett, licensee of the trademarks "EAGLE 20's" and "EPIC" (the "Marks") herein sublicenses to GPA the right to use the Marks and Property (as hereinafter defined) for the purpose of selling cigarette "Product" (defined in § 4(a) hereof [as "cigarette products bearing the Marks of the varieties shown on *Appendix C*"]) manufactured exclusively by Liggett. In addition to providing manufacturing services, Liggett will also take orders, ship and invoice the Product to GPA Customers (as hereinafter defined), bear a portion of the liability for returned Product, and bear the entire credit risk for invoices for Product unpaid by GPA Customers. GPA will develop an "area-exclusive distributor network" to market and sell the Product, and generally promote the sale of the Product. GPA will not take title to the Product. GPA and Liggett will set the GPA Price (as hereinafter defined) at which the Product is sold to GPA Customers.

Agreement at § 2(a).[3] The Agreement further provides that "... Liggett shall, as GPA's manufacturer, receive orders from and bill GPA Customers for Product at the GPA Price; and pay to GPA monthly a 'GPA Rebate' ..." Agreement at § 14(a).

The Agreement contains separate provisions with respect to termination with and without cause. Notably, the Agreement contemplates different rights and obligations depending on whether termination is with or without cause. Certain of the provisions concerning termination are set forth in the margin.[4]

(b) *By Either Party With Cause.*
... It is specifically understood that "with cause" for GPA shall be limited to Liggett's breach of any material obligation under this Agreement; and that "with cause" for Liggett shall be limited to 1) GPA's breach of any material obligation under this Agreement; 2) GPA's failure to make the specified annual Sales Targets, provided that such failure is not due to Liggett's failure to perform its obligations hereunder; or 3) GPA's failure, in connection with the performance of its obligation under this Agreement, to comply in a material respect with any federal and state laws ...
(c) *Effective Date of Termination.*
Any notice of termination without cause of this Agreement given by either party shall be effective ninety (90) days from the date of the

The Agreement provides for an initial five year term, subject to renewal (with certain modifications) dependent upon meeting certain conditions precedent. Agreement at § 18(a). The term of the Agreement commences "on March 1, 1993 and shall end five years from the first day of the month following the date of first shipment by Liggett of the Product to any GPA Customer". *Id.*

The Agreement also contains annual "Sales Targets". Specifically, the Agreement provides:

> The production and sales targets ("Sales Targets") for the first five years of this Agreement are as follows, with "Contract Years" being that 12–month period commencing with the first day of the month following the date of the first shipment of the Product and each succeeding 12–month period thereafter; and "Unit" being one single cigarette ...

Agreement at § 11(e). The Agreement provides that the Sales Target for the first Contract Year is 600 million units.[5]

The parties agree that EAGLE was first delivered for distribution in May 1993 and EPIC was first delivered for distribution in August 1993.[6]

### C. Termination of the Agreement

It is undisputed that on August 3, 1994, Liggett sent GPA a termination notice for cause for "failure to meet Sales Targets" pursuant to § 11(e) of the Agreement. It is, however, vigorously disputed whether Liggett had cause to terminate the Agreement.

GPA argues that it was impossible to terminate the Agreement for cause for failure to meet its specified annual Sales Target because the Contract Year had not concluded. Specifically, GPA argues that the Contract Year did not begin to run until both products (EAGLE and EPIC) were delivered by Liggett. GPA argues that since products under the EPIC mark were not delivered until August 1993, the first Contract Year does not end until August 31, 1994. GPA further argues that when the Contract Year is computed on this basis, GPA would have met all of its Sales Targets and, moreover, GPA was in full compliance of its obligations under the Agreement.[7]

---

notice. Any notice of termination with cause shall be effective, if not susceptible of cure, immediately on receipt of the notice of termination ...

20. *OBLIGATIONS ON TERMINATION.*

. . . . .

(b) *Assignment of Marks and Property in Certain Events.* Notwithstanding any provision herein to the contrary ... in the event that: 1) Liggett terminates this Agreement without cause ... *and* 2) GPA has achieved its Sales Targets prorated through the date of termination as specified herein, or such failure is due to Liggett's failure to perform its obligations hereunder; *and* 3) the termination shall not have been caused in part or in whole by the fact that a) GPA has failed to approve samples of the Product, or b) that Liggett and GPA have failed to agree on cylinder costs or GPA Price or credit terms; then Liggett shall secure the consent of Eve Holdings to the assignment for fair market value of the Marks and Property to GPA ...

(c) *Windup Obligations.*

During the six-month period immediately following the effective date of termination, or such additional period to which Liggett and GPA shall agree in writing ..., GPA shall use its best efforts to arrange for the sale of all inventory of the Product in Liggett's inventory....

5. Section 17 of the Agreement provides

> Within fifteen (15) days after the end of each week and month, Liggett shall furnish to GPA a report showing the number of sales of each variety of the Product by GPA Customer and by ship point, and whether these sales exceed or fall below monthly and year to date Sales Targets ...

It is not disputed that Liggett sent GPA weekly and monthly reports on the amount of each Liggett product shipped from its warehouses. GPA, however, argues that these reports never advised them as to whether the sales were above or below the targets. Hearing Transcript at 91.

6. While GPA's Complaint refers to an April distribution date for EAGLE, other GPA submissions refer to a May distribution date for EAGLE. For purposes of this motion, the Court will assume that EAGLE was first delivered in May 1993.

7. Mark Dunham testified that despite the fact that his original affidavit erroneously computed sales from September 1993 through July 1994 as 552,386,000 units, instead of 517,238,000 units, and projected August 1994 sales of 57,374 units, GPA could, nevertheless, have made the 600 million unit Sales Target by August 31, 1994. Hearing Transcript at 82, 93. The Dunham Reply Affidavit states that this error in arithmetic is of no moment because, "the termination notice by Liggett came one month too early and that to the

GPA maintains that Liggett's purported termination with cause was merely a pretext to avoid its obligations under the Agreement when termination is without cause, including the obligation to assign the Marks. GPA further alleges that immediately after Liggett sent the August 3, 1994 termination notice, Liggett "contacted numerous customers of GPA and advised them that they were to no longer do business with GPA and only purchase the 'EAGLE 20's' and 'EPIC' Product directly from Liggett".

Finally, GPA alleges in its complaint that if it "is unable to meet its annual sales target such failure is solely and as a direct result of Liggett's unlawful conduct and failure to perform its obligations under the Agreement."

Liggett argues that GPA was terminated because it had not achieved Sales Targets. Specifically, by the end of May, 1994, only 472,486,000 units of EPIC and EAGLE were sold to GPA's customers. Liggett further argues that (1) GPA's interpretation of when the Contract Year commences is erroneous—there was no requirement that *both* products had to be shipped—the first shipment of EAGLE was in May 1993, and consequently the Contract Year commenced on June 1, 1993, (2) Liggett was not responsible for GPA's failure to sell the targeted 600 million units but, in fact, assisted GPA in numerous ways even though they were under no obligation to do so, and (3) assuming arguendo that the Contract Year expired on August 31, 1994 and accepting GPA's projection of what it could have sold in August (as set forth in the Dunham Affidavit), GPA would still be short of the Sales Targets.

GPA further contends that an incentive program entered into between GPA and Liggett estops Liggett from asserting a contract termination date of May 31, 1994. In particular, GPA alleges that on March 25, 1994, Liggett entered into an arrangement whereby GPA would be entitled to a 10 cent per carton rebate on EPIC and EAGLE if GPA sells 322.5 million units in the first six months of 1994 (the "Incentive Program"). Having met those sales targets on June 30, 1994, GPA contends Liggett cannot cancel

for cause because GPA failed to meet a different Sales Target one month earlier on May 31, 1994.

With respect to the Incentive Program, Liggett argues that it had nothing to do with the Sales Targets for the first Contract Year. According to Mr. Harrison, the Incentive Program was instituted (in the midst of other negotiations) as a courtesy to GPA to offset in the short term the factory price increase of EPIC and EAGLE.

### D. Other Contentions

The parties also raised various other contentions. Since the Court does not need to reach the merits of the case for purposes of this decision a detailed discussion of these contentions is not warranted. However, certain issues raised by the parties concerning the promotion of EAGLE and EPIC are instructive as background to this decision.

It is not disputed that the distribution of private label cigarettes is different from the distribution of premium brand cigarettes. Here, GPA (not the manufacturer) has the responsibility to market and promote the cigarettes to tobacco and candy distributors, wholesale grocers, retail chains and the like. As part of its efforts to promote EAGLE and EPIC, GPA spent over $600,000 for, among other things, display racks, point of sale advertising and promotional items and roughly $400,000 in a coupon program. Hearing Transcript at 49–50.

Liggett observes that despite the fact that the Agreement expressly provided that Liggett's sales force and brokers are not required to provide any "hands-on" support to GPA and that the promotion of EPIC and EAGLE is exclusively the responsibility of GPA, it voluntarily provided over $366,000 in consumer coupons and excluded EPIC and EAGLE from three industry-wide price increases in order to give GPA the flexibility to market and price EAGLE and EPIC aggressively. Liggett further asserts that it ultimately used its own sales force to bolster GPA's fledgling group when it became apparent that GPA did not have the distributor

---

extent GPA could not make Sales Targets, it was only because of the problems caused by Liggett's

slow production. . . ." Dunham Reply Affidavit at ¶ 17.

contacts or the resources to develop and increase the business. Finally, Liggett argues that GPA, in violation of the Agreement, failed to treat Liggett's products in the same manner that it was treating Philip Morris' SHIELD product.

### E. GPA's Allegations of Irreparable Injury

The Court, as noted above, has considered a substantial amount of evidence in this matter. A significant amount of that evidence focuses on GPA's allegations of irreparable injury. GPA's initial moving papers and the Dunham Affidavit describe (often in vague terms) the loss of business as a result of termination of the Agreement. *See generally* Dunham Affidavit at ¶¶ 76–83 ("[t]here is also the *distinct possibility* that without the availability of the Epic and Eagle 20's brands, GPA will not survive long as a going concern" ... 41% of gross sales and 43% of gross profits are attributed to sales of EPIC and EAGLE [8] ... "the permanent or even extended loss of this revenue from Epic and Eagle 20's *could* result in GPA's insolvency") (emphasis added). The arguments and evidence in these submissions fail to persuade the Court of the likelihood of irreparable injury. GPA's reply papers, including the Dunham Reply Affidavit and affidavits and letters submitted supplied by GPA's customers, and the evidence and testimony presented by GPA at the Hearing similarly fails to persuade the Court of the likelihood of irreparable injury. What is more, the affidavits, declarations and Hearing testimony demonstrate that GPA's injury is *calculable* in terms of loss of specific sales and lost future profits. A grant of preliminary injunctive relief is, therefore, inappropriate.

### DISCUSSION

■ In order to obtain a preliminary injunction in this Circuit, the applicant must show:

(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

*Deeper Life Christian Fellowship, Inc. v. Board of Education,* 852 F.2d 676, 679 (2d Cir.1988) (citing *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979) (per curiam)). "It is well established that 'irreparable injury means injury for which a monetary award cannot be adequate compensation.'" *Loveridge v. Pendleton Woolen Mills, Inc.,* 788 F.2d 914, 917 (2d Cir.1986) (quoting *Jackson Dairy,* 596 F.2d at 72). "Likewise, where money damages are adequate compensation, a preliminary injunction will not issue since equity should not intervene where there is an adequate remedy at law." *Id.* at 918 (citations omitted). Furthermore, "a preliminary injunction is an extraordinary remedy that should not be granted as a routine matter." *JSG Trading Corp. v. Tray–Wrap, Inc.,* 917 F.2d 75, 80 (2d Cir.1990). In this Circuit, a party seeking preliminary injunctive relief must show a *likelihood* of irreparable injury, not a *possibility* of irreparable injury, and "[l]ikelihood sets, of course, a higher standard than 'possibility'". *Id.* at 79.

■ GPA argues that it is entitled to injunctive relief because it has demonstrated irreparable injury, likelihood of success on the merits and the balance of hardships tips in its favor. With respect to irreparable injury, GPA argues, as discussed above, that it is entitled to injunctive relief because Liggett's breach of the Agreement "adversely affects [its] ability to continue to conduct business in a meaningful manner", there is the "distinct possibility" that without EPIC and EAGLE, GPA will not survive long as a going concern and the loss of EAGLE and EPIC will result in irreparable damage to GPA's reputation, goodwill and business. GPA's arguments are not supported by fact or law.

Notably the Dunham Reply Affidavit describes the affidavits and letters submitted

---

8. Mr. Dunham's reply affidavit states that these sales account for 56% of GPA's revenues and 46% of its gross profits in July 1994 (the remainder is derived almost primarily from sales of SHIELD). Affidavit of Mark Dunham sworn to August 15, 1994 ("Dunham Reply Affidavit) at ¶ 50.

by GPA's customers as "reflecting the fact that their confidence in GPA as a dependable supplier of product has been shakened [sic] and that GPA's reputation and goodwill will undoubtedly be irreparably damaged if it is not permitted to continue selling EAGLE and EPIC pursuant to the Agreement." Dunham Reply Affidavit at ¶ 44; *see also* Hearing Transcript at 53, 98, 100. The affidavits and letters referred to do not compel a finding of loss of goodwill and irreparable injury.

Specifically, GPA's papers focus on three affidavits, yet none of the affiants (including these three) affirmatively state that they will not do business with GPA in the future. For example, while Danny L. Pierce of Wagner Candy Company states that he was "shocked" when he learned that GPA would no longer be selling EAGLE, he, nevertheless, avers that he *would* do business with GPA in the future". Similarly, Mike Devine of Rock Island Distributing Co., which purchases both EPIC and SHIELD from GPA, expresses concern over the future viability of GPA in light of Liggett's action. Noticeably absent from Mr. Devine's affidavit, however, is any mention that Rock Island is withdrawing its SHIELD business or that it would not do business with GPA in the future.

The Affidavit of Ricky Jones of Andalusia Distributing Company, Inc. similarly does not support a finding of loss of goodwill and likelihood of irreparable injury. Mr. Jones states that the "fact that GPA may lose the EPIC brand would give me significant concern about dealing with them in the future [and] [i]f GPA loses the EPIC brand permanently and then for example comes to me some time in the future with a new cigarette brand, I must admit I would be gun shy about doing business with them again." Again, Mr. Jones expresses concern: he does not state that he would not do business with GPA and, in fact, contemplates GPA obtaining a replacement brand for EPIC. Indeed, the Court finds that the statement by Mr. Jones that EPIC, and other private label cigarettes, are "sold almost exclusively on price" (a statement echoed in the Hearing testimony of John B. Green of P.M. Green & Sons) further militates against a finding of

irreparable injury. In sum, GPA's customers' affidavits and letters reflect concern, apprehension and the need for assurances going forward. Noticeably absent are statements that these customers will not do business with GPA in the future. The Court finds that these affidavits do not reflect a loss of goodwill or business destruction sufficient to support a finding of likelihood of irreparable injury.

Similarly both the affidavit and Hearing testimony of John B. Green does not support granting injunctive relief. As with the other affiants, Mr. Green expresses concern and surprise as a result of GPA's termination but he neither affirmed nor testified that he would not do business with GPA in the future.

Having failed to demonstrate loss of goodwill, GPA may not find solace in those cases where loss of goodwill has been held to constitute irreparable injury in situations involving termination of a franchise or distributorship. *See, e.g., Jacobson & Co. v. Armstrong Cork Co.,* 416 F.Supp. 564 (S.D.N.Y.1976), *aff'd,* 548 F.2d 438 (2d Cir.1977). Indeed, such an assumption is premised on GPA being analogous to a distributorship or franchise. This assumption does not necessarily follow from the record before the Court. For example, GPA has no inventory; the product is shipped to GPA's customers by Liggett; GPA's customers pay Liggett directly; and Liggett bears any credit risk. Even assuming that GPA had demonstrated loss of goodwill and that the distributorship analogy was appropriate, the fact that GPA and Liggett's relationship was relatively new militates against a finding of irreparable injury. *See Jack Kahn Music Co. v. Baldwin Piano & Organ Co.,* 604 F.2d 755, 763 (2d Cir.1979) ("It is critical to this case to keep in mind the fact that the tentative and exploratory dealership lasted only one and one-half years from the date of signing the agreement to the date of sending the written cancellation notice. This short period of time and the performance record ... make it doubtful that there was sufficient time to build up much reputation and goodwill"). Moreover, the testimony of Mr. Green and Mr. Jones reflect that GPA's customers are not focused

on a particular product but on purchasing an inexpensive product. This factor also militates against a finding of irreparable injury. *See Newport Tire & Rubber Co. v. Tire & Battery Corp.*, 504 F.Supp. 143 (E.D.N.Y. 1980).

Indeed, the very fact that the dealership analogy is strained argues against granting injunctive relief. In *Loveridge v. Pendleton Woolen Mills, Inc.*, 788 F.2d 914 (2d Cir. 1986), plaintiff, a sales representative disputing his termination, sought to rely on terminated dealership cases to support his claim of irreparable harm. The Second Circuit, in reversing a grant of a preliminary injunction, found it significant that (1) plaintiff owned no inventory, the manufacturer shipped the merchandise directly to the accounts and the accounts paid the manufacturer (as in the instant action), (2) plaintiff did not have considerable investments in a showroom, factory, or warehouse (as in the instant action)[9], (3) plaintiff did not have numerous employees (GPA has 12 employees including a sales force of 5 individuals), and (4) defendant was not allowing plaintiff's territory and customers to languish but brought in replacement sales representatives. The Court noted that if plaintiff "should ultimately succeed on the merits of his underlying claim, he may regain his territory. Thus, during the pendency of this litigation [plaintiff's] territory is being continued and preserved for him" (as in the instant action). *Id.* at 917.

Moreover, the Court is not persuaded that the percentage that EAGLE and EPIC represented of GPA's business is so significant that the loss justifies a preliminary injunction. The law requires that the injury to a business necessary to support a grant of a preliminary injunction must be damage to the business as a whole (as opposed to a temporary or partial disruption) and that damage must be immediate. *See Jack Kahn Music*, 604 F.2d 755 (threat has to be imminent and rejecting loss of goodwill as a basis for injunctive relief where, among other things, entire business not destroyed); *Truglia v. KFC Corp.*, 692 F.Supp. 271, 279 (S.D.N.Y.1988), *aff'd*, 875 F.2d 308 (2d Cir.

1989) ("loss or destruction of an entire business has also widely been held to constitute irreparable harm, at least when the business has been in operation for some time") (citations omitted). Further, the Court is not persuaded that GPA cannot either find a replacement product for EAGLE and EPIC or, alternatively, make up for the loss in sales by focusing on SHIELD. Additionally, the Court is not persuaded that the loss of the EAGLE and EPIC product lines will put GPA at such a disadvantage as to justify a preliminary injunction where, the Court has determined, based on the evidence before it, that the products are not unique and price is the motivating factor in the sale of control label and private label cigarettes. These facts (along with other facts, such as Liggett's continuing to provide cigarettes to GPA's former customers) distinguish the instant case from the line of cases in which courts have held that "terminating the delivery of a *unique* product to a distributor whose customers expect and rely on the distributor for *continuous supply* of that product almost inevitably creates irreparable damage to the good will of the distributor." *Reuters Ltd. v. United Press Int'l Inc.*, 903 F.2d 904, 907–08 (2d Cir.1990) (citations omitted) (emphasis added).

■ GPA's allegations that Liggett is on the brink of bankruptcy are also not sufficient as a matter of fact or law to support its request for injunctive relief. *See generally Firemen's Ins. Co. v. Keating*, 753 F.Supp. 1146, 1153 (S.D.N.Y.1990) ("It is familiar law that where a non-movant's assets may be dissipated before final relief can be granted ... such that an award of monetary relief would be meaningless, injunctive relief is proper"). GPA's allegations with respect to Liggett's financial condition "fall well short of the clear requirement that '[t]o establish irreparable harm, plaintiffs must demonstrate an injury that is neither remote nor speculative, but actual and imminent.'" *Id.* (citations omitted) (internal quotations omitted).

Mr. Dunham also testified that the loss of EPIC and EAGLE will result in the "possible" insolvency of GPA. Hearing Transcript

---

9. The Court, as stated above, recognizes that GPA has spent money promoting EAGLE and

EPIC but, nevertheless, finds *Loveridge* instructive.

at 52. The possibility of insolvency was neither established at the Hearing nor would such possibility, in any event, have been found sufficient to support a finding of irreparable injury. *See JSG Trading Corp.*, 917 F.2d at 79.

Finally, the affidavits, declarations and Hearing testimony demonstrate that money damages can be quantified here. *See Loveridge v. Pendleton*, 788 F.2d at 917.

 The Court also observes that a preliminary injunction in the instant case that would require the parties to resume their ruptured relationship under the Agreement is analogous to a shotgun wedding. The Second Circuit, in reversing the grant of a preliminary injunction in *Jack Kahn Music*, an antitrust action, made the following observation which is instructive here:

> In recent years there has been developing a substantial body of decisional law affecting a small but important segment of the law relating to the cancellation of retail dealerships by manufacturers ... As the conclusion of the trial on the merits of the antitrust suit will in the normal course of events in all likelihood not take place for some years, if at all, the granting of such a preliminary mandatory injunction amounts as a practical matter, as here, to freezing plaintiff's revocable and hence temporary dealership into a dealership non-revocable for a substantial period.

*Jack Kahn Music*, 604 F.2d at 757. Additionally, and while not dispositive here, movants seeking a mandatory preliminary injunction, undoing the status quo (restoring the Agreement), are subject to a heightened standard of proof. *See SEC v. Unifund SAL*, 910 F.2d 1028, 1039 (2d Cir.1990) ("plaintiffs have been put to a more rigorous burden in obtaining preliminary injunctions that order some form of mandatory relief"); *Christian v. New York State Board of Law Examiners*, 1994 WL 62797, 1994 U.S.Dist. LEXIS 1876 (S.D.N.Y. Feb. 18, 1994) (same).

Since the Court has found that GPA has not demonstrated irreparable injury, and although movant has submitted substantial and often compelling evidence on the question of likelihood of success on the merits that issue need not be addressed at this time. *See*

*Reuters Ltd.*, 903 F.2d at 907 ("Because a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction ... the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered") (citations omitted) (internal quotations omitted).

*CONCLUSIONS*

For the reasons set forth above, GPA's request for preliminary injunctive relief is denied. The parties are directed to appear for a pre-trial conference on September 8, 1994 at 10:00 a.m. in Courtroom 2703. The parties shall be prepared to discuss, among other things, an expedited discovery schedule and an early trial date.

SO ORDERED.