**AIR TRANSPORT INTERNATIONAL LIMITED LIABILITY COMPANY, Plaintiff,**

v.

**AEROLEASE FINANCIAL GROUP, INC., Defendant.**

**No. Civ. 3:97cv2691 (CFD).**

United States District Court, D. Connecticut.

Feb. 5, 1998.

James J. Tancredi, Honor S. Heath, Gary Mann Becker, Day Berry & Howard, Hartford, CT, David E. Springer, John K. Lyons, Amarjeet S. Bhachu, Skadden, Arps, Slate, Meagher & Flom, Chicago, IL, for plaintiff.

Gregory W. Nye, Judith Hession Friedman, Hebb & Gitlin, A Professional Corp., Hartford, CT, for defendant.

### RULING ON PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

DRONEY, District Judge.

## I. INTRODUCTION

The plaintiff, Air Transport International Limited Liability Company, brings this action alleging that the defendant, Aerolease Financial Group, Inc., illegally replevied an aircraft engine in violation of 42 U.S.C. § 1983 and the Connecticut Unfair Trade Practices Act, Conn.Gen.Stat. § 42–110a *et seq.* Additionally, plaintiff asserts common law claims for conversion, breach of contract and breach of the duty of good faith and fair dealing.

Pending before the court is plaintiff's Application for Preliminary Injunction [doc. # 4] in which the plaintiff requests this court to order the defendant to return the engine to the plaintiff. For the reasons stated below, the plaintiff's motion for a preliminary injunction is DENIED.

## II. FINDINGS OF FACT

Based on the record before the court, including the testimony and exhibits introduced at a hearing held on January 20, 1998, the court makes the following findings of fact and conclusions of law pursuant to Fed. R.Civ.P. 52(a).

### A. *THE PARTIES*

1. Air Transport International Limited Liability Company ("ATI") is a limited liability company organized under the laws of the State of Nevada. Its principal office is located in Little Rock, Arkansas.

2. Aerolease Financial Group, Inc. ("Aerolease") is a corporation organized under the laws of the State of Florida. Its principal office is located in Miami, Florida.

3. Aerolease is a lessor of aircraft and jet engines. Aerolease has entered into a number of aircraft leases as trustee for the benefit of the Aerolease Financial Group, a Florida general partnership.

4. ATI provides domestic and international cargo and combination passenger and freight charter service for private companies and the Air Mobility Command (the "AMC"), a unit of the United States Department of the Air Force.

5. ATI is a financially distressed company presently engaged in restructuring its affairs.

6. Currently, ATI owns three DC–8 aircraft, leases another eight DC–8 aircraft from various lessors (including Aerolease), and operates additional aircraft.

### B. *THE N788AL LEASE*

7. On or about October 1, 1992, Air Transport International, Inc. as lessee and Aerolease as lessor entered into an Aircraft Lease Agreement (as amended, the "Lease") for one McDonnell Douglas DC–8–63F aircraft bearing serial number 45999 and United States registration number N788AL (the "N788AL Airframe") and four Pratt & Whitney JT3D–7 engines: engines 671151 ("Engine 151"), 645778, 671271, and 678980 (collectively, the "788 Engines").

8. On October 6, 1992, Air Transport International, Inc. took delivery of the Aircraft, including the four engines listed in finding B.7, above.

9. On July 15, 1994, with Aerolease's permission, Air Transport International, Inc. assigned its rights and obligations under the Lease to ATI.

10. In exchange for possession of the N788AL Airframe and four engines (collectively, the "Aircraft"), ATI was obligated to pay "Rent" to Aerolease.

11. The Lease defines Rent as (a) "Fixed Monthly Rental" plus "Variable Monthly Rental" (which was subsequently eliminated by Amendment No. 3); (b) "Airframe Reserves" based upon the number of hours the N788AL Airframe is flown; and (c) "Engine Reserves" based upon the number of hours an engine is flown. *See* Lease §§ 5, 6 and Exh. H.[1]

12. Engine Reserves are intended to compensate Aerolease for depreciation of the engine (depletion of engine service life) during the term of the Lease or to reimburse ATI for repairs which restore the engine's service life. *See* Lease, § 6(C). Under the Lease, ATI is entitled to the return of all unused Engine Reserve payments after appropriate deductions. Lease, Exh. H.

### C. *REPLACEMENT OF AIRCRAFT ENGINES*

13. It is common industry practice for engines to be moved to various airframes within a given carrier's fleet, including other airframes owned by the carrier or leased from other lessors.

14. In keeping with common industry practice, the Lease did not require Engine 151 or the other 788 Engines to remain on the N788AL Airframe. Accordingly, ATI removed and replaced various engines on the Aircraft for purposes of repair, servicing or use on other aircraft in ATI's fleet.

15. On August 13, 1994, Engine 151 was removed from the N788AL Airframe to replace an expired "T–1 Disk" on Engine 151.

16. After Engine 151 was repaired, it was installed on another aircraft.

17. On December 19, 1996, ATI removed Engine 151 from this second aircraft for "company convenience."

---

1. The Lease was introduced during the preliminary injunction hearing as Joint Exhibit B, § 21. Hereinafter, references to specific provisions of the Lease will be identified in the following manner: Lease §.

18. In January 1997, ATI attempted to return Engine 151 to Aerolease, but Aerolease rejected it because the Engine had failed a boroscope test inspection.

19. On January 20, 1997, ATI delivered Engine 151 to Wood Group Aero, Inc. ("Wood Group") in East Windsor, CT, for repairs and to bring the engine into compliance with an "airworthiness directive" issued by the United States Federal Aviation Administration (the "FAA").

## D. TERMINATION OF THE LEASE

20. The Lease, consistent with common industry practice, provides that upon termination of the lease, ATI may return the Aircraft with different engines than those that were originally attached to it when the Lease was executed ("Replacement Engines"), See Lease, § 1(EE).

21. The Lease has been amended on several occasions, including an amendment dated July 10, 1995 ("Amendment No. 3"), which provided that the term of the Lease would expire on March 3, 1998. However, Amendment No. 3 also gave Aerolease "the right to terminate the Lease on December 31, 1996, by giving [ATI] at least one hundred and twenty days prior written notice."

22. On July 25, 1996, in accordance with Amendment No. 3, Aerolease gave ATI written notice that Aerolease would terminate the Lease on December 31, 1996.

23. The Lease requires the following events to occur when the Lease is terminated:

(a) Aerolease must make certain "Lease–End Adjustments" as defined in the Lease. See Lease § 6(D), Exh. H.

(b) ATI must deliver the N788AL Airframe with four engines (not necessarily the four original engines) to Aerolease. See Lease, § 24.

(c) Aerolease must execute an Aircraft Redelivery and Acceptance Receipt. See Lease, § 24(I).

(d) Aerolease must return ATI's security deposit. See Lease, § 7.

24. On February 3, 1997, ATI and Aerolease signed a lease termination agreement (the "Termination Agreement"), to be effective upon redelivery of the N788AL Airframe and four engines, including three Replacement Engines.

25. As reflected in the Termination Agreement, the only original engine remaining on the Aircraft at the time of redelivery was engine number 678980. ATI retained possession of Engine 151 after redelivery.

26. The Termination Agreement provided that in addition to engine number 678980, Aerolease would accept three Replacement Engines (engine numbers 669753, 671269, 645970), each of which were under a different lease between ATI and Aerolease dated June 16, 1994 (the "784 Lease").

27. In accordance with the Lease, the following termination events occurred in February, 1997:

(a) Aerolease made the Lease End Adjustments.

(b) ATI returned the N784AL Airframe and four engines, including three Replacement Engines, to Aerolease.

(c) Aerolease signed an Aircraft Redelivery and Acceptance Receipt.

(d) Aerolease returned ATI's security deposit.

## E. ENGINE 151 AND WOOD GROUP

28. Engine 151 was not on the N788AL Airframe when the Lease was terminated and the N788AL Airframe was returned to Aerolease. As discussed in paragraph C. 19 above, Engine 151 had been delivered to Wood Group on January 20, 1997 for repair.

29. In May, 1997, Wood Group completed the repairs on Engine 151.

30. On July 14, 1997, ATI requested that Aerolease release Engine Reserves totaling $272,256.67 to pay Wood Group for the repairs performed on Engine 151, in accordance with the Lease and the Termination Agreement.

31. On July 24, 1997, Aerolease wired $272,256.67 to ATI to be used to pay Wood Group for the repairs Wood Group made on Engine 151.

32. As of September 10, 1997, ATI had not paid any of the $272,256.67 it owed to Wood Group.

33. On October 27, 1997, ATI and Wood Group entered into a payment plan pursuant to which ATI agreed to make scheduled payments to pay Wood Group for the repairs performed on Engine 151 and another engine.

34. Under the payment plan, Wood Group agreed to apply the payments first to the balance owed on Engine 151 and next to the balance owed with respect to the other engine.

35. As of December 16, 1997, ATI had timely made all scheduled payments and owed Wood Group one more scheduled payment in the amount of $42,256.

36. Under the payment plan, Wood Group agreed to immediately release Engine 151 to ATI after the last payment was made.

37. ATI's last payment for Engine 151 was due on December 19, 1997.

38. On December 18, 1997, a day before ATI was to make its final payment, Aerolease paid Wood Group the remaining sums owed on Engine 151 and had a Connecticut Deputy Sheriff serve Wood Group with a replevin action under Connecticut law.

39. Pursuant to the replevin, Aerolease took possession of Engine 151 and transported it to Miami, Florida.

40. Engine 151 is now at a warehouse in Miami.

41. ATI was not named as a party to the replevin action filed by Aerolease.

42. Before it was replevied by Aerolease, ATI intended to use Engine 151 as a spare engine.

### F. *THE N784AL LEASE*

43. Aerolease's decision to replevy Engine 151 was related to another lease between Aerolease and ATI (the "N784AL Lease"). Under the N784AL Lease, ATI leased one airframe (the "N784AL Airframe") and four engines.

44. At some point, Aerolease decided to repossess the N784AL Airframe and its engines.[2]

45. On September 10, 1997, Aerolease repossessed the N784AL Airframe.

46. At the time of its repossession, two of the four engines on the N784AL Airframe belonged to ATI.

47. Aerolease permitted ATI to remove the two engines belonging to ATI, anticipating that ATI would replace those two engines with two engines leased by ATI from Aerolease, so that the N784AL Airframe would have its full complement of four engines.

48. ATI did not give Aerolease two additional engines in exchange for the two ATI removed. Accordingly, Aerolease only repossessed the N784AL Airframe and two engines.

49. Once the N784AL Airframe was repossessed, ATI stopped paying rent under the N784AL Lease.

### G. *SPARE ENGINES*

50. It was important for ATI to have spare engines in order to operate its business properly: to ensure its aircraft could operate safely and reliably and meet its schedule.

51. Engine 151 is not unique and similar engines capable of being installed on ATI aircraft are readily available in the marketplace.

52. ATI has available to it several engines capable of being installed and operated on ATI aircraft that could also function as spare engines for its fleet.

53. ATI recently obtained one engine which has been designated a "spare engine."

54. ATI could obtain at least two fully operational additional engines for use as spare engines, but because ATI has not paid outstanding repair bills for those engines, ATI has not obtained them.

55. ATI maintains that redelivery of the 788 Aircraft with the four engines did not terminate its right to possess Engine 151

---

2. ATI disputes the propriety of Aerolease's decision to repossess the N784AL Airframe and en-

gines. There is a separate action pending in Florida concerning the repossession.

under the Lease and that the replevin of Engine 151 was wrongful under Connecticut law and violated ATI's due process rights under the Fourteenth Amendment to the U.S. Constitution.

56. Aerolease maintains that it was entitled to repossession of Engine 151 after October 1, 1997 because no leases between ATI and Aerolease permitted possession of Engine 151 following the termination of the Lease and the N784AL Lease.

## III. CONCLUSIONS OF LAW

### A. *Standard of Review*

To prevail on a motion for a preliminary injunction, the party requesting relief must show: (1) the likelihood of irreparable injury; and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 967 (2d Cir.1995); *Waldman Publishing Corp. v. Landoll, Inc.*, 43 F.3d 775, 779–80 (2d Cir.1994).

■ When an injunction's terms would alter, rather than preserve, the status quo by commanding some positive act, the injunction is mandatory and the moving party must meet a higher standard than in the ordinary case by showing "clearly" that he or she is entitled to relief or that "extreme or very serious damage" will result from a denial of the injunction. *Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 34 (2d Cir.1995).

ATI is seeking a mandatory injunction ordering Aerolease to return Engine 151 to ATI. Accordingly, ATI must satisfy this higher standard.

### B. *Irreparable Harm*

ATI contends that it will suffer irreparable harm if its preliminary injunction application is denied. First, ATI argues that it will be irreparably harmed because the seizure of the engine has damaged, and will continue to damage, ATI's goodwill and places ATI's business in jeopardy. Second, ATI contends that even if it fails to otherwise establish irreparable harm, the injunction should be granted because when a deprivation of a constitutional right is alleged, irreparable harm is presumed.

### 1. *Evidence of Irreparable Harm*

ATI contends that the loss of control of Engine 151 has caused its employees, vendors and creditors to lose confidence in ATI, thus eroding its goodwill and threatening its continued viability. Additionally, ATI argues that the unavailability of Engine 151 will cause aircraft to be grounded, which will jeopardize ATI's contracts with its customers.

■ Irreparable injury is an injury that is not remote or speculative, but actual and imminent and for which monetary damages cannot adequately compensate. *Jayaraj v. Scappini*, 66 F.3d 36, 39 (2d Cir.1995). The loss of goodwill or a company asset can constitute irreparable harm when "the very viability of the plaintiff's business" is threatened or if the loss will be difficult to quantify at trial. *Tom Doherty*, 60 F.3d at 38. However, if the harm can be remedied with an award of monetary damages, injunctive relief is generally denied. *Id.* Although ATI presented evidence of its financial distress, it did not demonstrate that the replevin of Engine 151 would threaten ATI's viability.

Even if ATI could demonstrate that it would be irreparably harmed, it must also show that it could not prevent such harm. *Lanvin, Inc. v. Colonia, Inc.*, 739 F.Supp. 182, 193 (S.D.N.Y.1990) ("A movant . . . cannot mask an ongoing failure on its part to mitigate its damages as an ongoing instance of irreparable harm."). In *American Brands, Inc. v. Playgirl, Inc.*, 498 F.2d 947 (2d Cir.1974), the plaintiff sought a preliminary injunction to prevent the defendant from refusing to publish the plaintiff's advertisement in its magazine. The Second Circuit affirmed the district court's decision denying a request for an injunction because, among other factors, the plaintiff failed to show that similar advertising space was unavailable. *Id.* at 950.

▮ Here, ATI argues that it will be irreparably injured without having Engine 151 available for use as a spare engine. However, the evidence showed that similar engines capable of being used as spare engines for ATI aircraft are available and that ATI recently obtained one such spare engine. ATI could obtain at least two more fully operational engines from repair shops by paying its outstanding repair bills.

ATI also contends that Engine 151 is unique because it was recently modified to meet a new FAA airworthiness directive. According to ATI, under the FAA directive, all engines must satisfy certain requirements by "sometime in 1999." Pl. Mem. in Support of Mot. for Prelim. Inj. [doc. # 19] at ¶ 35. Even if the court were to find that Engine 151's compliance with an airworthiness directive (that will not be in force for another year) rendered Engine 151 unique, at least one of the engines that ATI has in a repair shop (and which ATI could obtain by paying the outstanding repair bill) also complies with the FAA's airworthiness directive. Furthermore, although ATI testified that only 18% of its engines currently meet this directive, no evidence was presented as to how many engines satisfying this directive were available for purchase or lease on the open market. *See GPA, Inc. v. Liggett Group, Inc.,* 862 F.Supp. 1062, 1069 (S.D.N.Y.1994) (denying a preliminary injunction where the plaintiff/distributor failed to establish that it could not find a replacement product to make up for the loss caused if defendant/manufacturer terminated its manufacturing agreement).

"[W]here monetary damages may provide adequate compensation, a preliminary injunction should not issue." *Jayaraj,* 66 F.3d at 39 (reversing the district court's granting of a preliminary injunction based on a violation of the due process clause because the plaintiff failed to meet its burden of establishing irreparable harm). Because ATI can readily replace Engine 151 through obtaining other available spare engines in the marketplace, or by paying repair bills for engines it owns, ATI has not established irreparable harm.

### 2. *Deprivation of Constitutional Right*

ATI asserts that Aerolease's seizure of Engine 151 violated ATI's due process rights because Aerolease failed to comply with Connecticut law when it replevied Engine 151. ATI claims that the writ of replevin was issued without prior authorization by the court and the replevin did not contain the requisite statutory notice in violation of Conn.Gen.Stat. 52–278e.

▮ ATI argues that the mere allegation of a deprivation of a constitutional right is sufficient to trigger a finding of irreparable harm. *Mitchell v. Cuomo,* 748 F.2d 804, 806 (2d Cir.1984) (affirming the district court's grant of a preliminary injunction to an inmate who alleged a violation of the Eighth Amendment right to be free from cruel and unusual punishment); *Jolly v. Coughlin,* 76 F.3d 468, 482 (2d Cir.1996) (affirming district court's decision granting a request for injunctive relief in an action claiming violation of the Eighth Amendment).

Although the decisions plaintiff relies on contain broad language which "seem to apply a blanket rule regarding irreparable harm where substantive constitutional rights are concerned, other courts have found that the mere allegation of a constitutional infringement in and of itself does not constitute irreparable harm. Rather district courts must consider the nature of the constitutional injury before making such a conclusion." *Pinckney v. Board of Education of the Westbury Union Free School Dist.,* 920 F.Supp. 393, 400 (E.D.N.Y.1996) (citing cases). *See also Hohe v. Casey,* 868 F.2d 69, 72–73 (3d Cir.), *cert. denied,* 493 U.S. 848, 110 S.Ct. 144, 107 L.Ed.2d 102 (1989) (recognizing that not all constitutional harms are synonymous with irreparable harm and that mere assertion of a First Amendment right does not automatically require a finding of irreparable harm; rather, the movant must show a "chilling" effect on protected activity); *New Alliance Party v. Dinkins,* 743 F.Supp. 1055, 1063 (S.D.N.Y.1990) (requiring movant to establish irreparable harm in an action alleging violation of First Amendment); *see also Public Serv. Co. of N.H. v. Town of W. Newbury,* 835 F.2d 380, 382 (1st Cir.1987) (recognizing that not all allegations of constitutional viola-

tions are sufficiently important to be irremediable by subsequent relief).

" '[T]he cases where courts have held that a constitutional deprivation amounts to an irreparable harm—are almost entirely restricted to cases involving alleged infringements of free speech, association, privacy, or other rights as to which temporary deprivation is viewed of such qualitative importance as to be irremediable by any subsequent relief.' " *Barrett v. Harwood,* 967 F.Supp. 744, 746 (N.D.N.Y.1997) (quoting *Marano v. New York City Transit Authority,* 1993 WL 17434 at *3 (E.D.N.Y.) (quoting *Public Service Co. of New Hampshire v. Town of West Newbury,* 835 F.2d 380, 382 (1st Cir.1987))).

Further, courts in this circuit have denied preliminary injunctive relief when plaintiffs alleging a constitutional violation failed to demonstrate irreparable injury. *See, e.g., Jayaraj v. Scappini,* 66 F.3d 36 (2d Cir.1995) (vacating the district court's issuance of a preliminary injunction based on a due process violation after finding that the movant failed to establish irreparable harm); *Savage v. Gorski,* 850 F.2d 64 (2d Cir.1988) (reversing district court's ruling granting a preliminary injunction in a case alleging violation of the First Amendment, in part, because the movant failed to establish that a preliminary injunction was necessary to avoid a "chilling effect" on First Amendment rights); *Meadows v. State Univ. of N.Y. at Oswego,* 832 F.Supp. 537 (N.D.N.Y.1993) (denying preliminary injunction in case alleging violation of First Amendment because movant failed to establish irreparable harm).

Here, ATI does not allege a systemic or ongoing constitutional violation that could not be remedied with a monetary award, but rather a single claim against Aerolease for failure to abide by the due process and statutory protections provided under Connecticut law. *Compare Covino,* 967 F.2d at 75 (challenging the constitutionality of a prison's policy of conducting visual body-cavity searches of pre-trial detainees). Because the nature of ATI's alleged constitutional injury is not of such qualitative importance as to be irremed-

iable by a subsequent monetary award, the court finds that plaintiff's claim of a due process deprivation is insufficient to establish irreparable harm. Accordingly, plaintiff's claim of a due process deprivation, without more, is insufficient to establish irreparable harm.[3]

## IV. CONCLUSION

In light of the foregoing, ATI's Application for a Preliminary Injunction [doc. # 4] is hereby DENIED.

It is so ordered.

---

**3.** Because ATI failed to satisfy its burden of demonstrating that it was likely to suffer irreparable harm if the preliminary injunction is denied, the court does not reach the issue of whether ATI could establish a clear likelihood of success on the merits.